<u>UNITED STATES COURT OF APPEALS</u>
<u>FOR THE NINTH CIRCUIT</u>
_____

CASE NO. 14-35819
_____

CASCADIA WILDLANDS, OREGON WILD, and CENTER FOR
BIOLOGICAL DIVERSITY, nonprofit corporations,
Plaintiffs-Appellants,
v.

JIM THRAILKILL, Field Supervisor, Roseburg Field Office, in his official
capacity; UNITED STATES FISH AND WILDLIFE SERVICE, an administrative
agency of the United States Department of the Interior, ROUGH AND READY
LUMBER, LLC, an Oregon Limited Liability Company, SWANSON GROUP
MFG. LLC, an Oregon Limited Liability Company, and BOISE CASCADE
WOOD PRODUCTS LLC, an Oregon Limited Liability Company.
Defendants-Intervenors-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF OREGON, Civ. No. 6:14-cv-01236-TC
_____

**PLAINTIFFS'-APPELLANTS' OPENING APPELLATE BRIEF**
_____

Susan Jane M. Brown (OSB #05460)   Jordan Beckett (OSB# 120666)
Western Environmental Law Center   Beckett Law Office PC
4107 NE Couch St.   2305 Ashland St. Suite C 311
Portland, OR. 97232   Ashland, OR 97520
Ph. (503) 914-1323   Ph. (541) 510-0333
Fax (541) 485-2457   Fax: (541) 210-9294
brown@westernlaw.org   jordan@roguevalleylawyer.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

I.      INTRODUCTION. ................................................................ 1

II.     STATEMENT OF JURISDICTION. ................................... 2

III.    ISSUES PRESENTED. ......................................................... 3

IV.     STATEMENT OF THE CASE. ............................................ 3

        A.      FACTUAL BACKGROUND. .................................... 4

                1.      *The Northern Spotted Owl (Strix occidentalis caurina).* ........... 4

                2.      *The Barred Owl (Strix varia).* ........................ 8

                3.      *Revised Recovery Plan for the Northern Spotted Owl.* ............. 9

                4.      *Northern Spotted Owl Use of Fire-Affected Forests.* ............... 11

                5.      *Post-Fire Timber Harvest.* ............................... 12

                6.      *The Douglas Fire Complex and the Douglas Fire Complex Recovery Project.* ............... 13

        B.      LEGAL BACKGROUND. ........................................ 15

                1.      *The Endangered Species Act.* .......................... 15

                2.      *The Administrative Procedure Act.* .............. 18

V.      SUMMARY OF THE ARGUMENT. ................................ 19

VI.     STANDARD OF REVIEW. ............................................... 20

        A.      STANDARD OF REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT. ................ 20

        B.      STANDARD OF REVIEW FOR DENIAL OF A PRELIMINARY INJUNCTION. ....................... 21

C.     STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION. ............................................................ 22

VII.  CASCADIA HAS RAISED SERIOUS QUESTIONS AND IS LIKELY TO PREVAIL ON THE MERITS ...................................... 24

A.    FWS Failed to Use the Best Available Scientific Information in Assessing Jeopardy to the Threatened Northern Spotted Owl from the Proposed Action. ............................................ 24

1.    *Barred Owl Effect on Spotted Owl Presence/Absence.* ............ 24

2.    *Expanding and Shifting Spotted Owl Home Ranges and Core Areas.* ................................................................ 29

B.    FWS Failed to Use the Best Available Scientific Information to Recover the Threatened Northern Spotted Owl ................................ 34

1.    *Recovery Action 10.* ................................................ 36

2.    *Recovery Action 12.* ................................................ 40

VIII. CASCADIA AND THE NORTHERN SPOTTED OWL ARE SUFFERING IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF, THE BALANCE OF EQUITIES TIPS IN FAVOR OF AN INJUNCTION, AND AN INJUNCTION IS IN THE PUBLIC INTEREST. ...................................................... 44

IX.   CONCLUSION. ...................................................... 55

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A) .................................. 56

CORPORATE DISCLOSURE STATEMENT ............................................ 57

CERTIFICATE OF SERVICE ...................................................... 59

STATEMENT OF RELATED CASE .................................................. 60

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ...... passim

*Amoco Prod. Co. v. Gambell*, 480 U.S. 531 (1987) ....................................... 51, 55

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) ................................................. 49

*Arrington v. Daniels*, 516 F.3d 1106 (9th Cir. 2008) ........................................... 29

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725

    (9th Cir. 1999) ............................................................................................. 21

*Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ...... 32

*Chalk v. U.S. Dist. Court Cent. Dist.*, 840 F.2d 701 (9th Cir. 1988) .................... 21

*Citizen's Alert Regarding Environment v. U.S. Dep't of Justice*, 1995 WL 748246,

    11 (D.D.C. 1995) ........................................................................................ 55

*Ctr. For Native Ecosystems v. U.S. Fish & Wildlife Serv.*, 795 F. Supp. 2d 1199,

    1207 (D. Colo. 2011) .................................................................................. 48

*Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085 (E.D. Wash. 2006) ......... 46

*Defenders of Wildlife v. Sec'y, U.S. DOI*, 354 F. Supp. 2d 1156 (D. Or. 2005) ... 46

*Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946 (9th Cir. 2005) ................... 19, 36

*Does 1-5 v. Chandler*, 83 F.3d 1150 (9th Cir. 1996) ...................................... 21, 22

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................................. 18

*Forest Conserv. Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) ... 46

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992) ............................. 20

*Hoffman on behalf of NLRB v. Cement Masons Union Local 337, etc.*, 468 F.2d
    1187 (9th Cir. 1972) .................................................................................. 50

*Hopi Tribe v. Navajo Tribe*, 46 F.3d 908 (9th Cir. 1995) ..................................... 22

*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) ........................ 20

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ...................................................... 19

*Kettle Range Conserv. Group v. U.S. BLM*, 150 F.3d 1083 (9th Cir. 1998) ......... 52

*L.A. Mem'l Coliseum Com. v. Nat'l Football League*, 634 F.2d 1197 (9th Cir.
    1980) ........................................................................................................... 53

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ............................. passim

*Marbled Murrelet v. Pacific Lumber Co.*, 83 F.3d 1060 (9th Cir. 1996) .............. 46

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ..................................... 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.
    29 (1983) ..................................................................................................... 30

*Mount Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992) ........... 19

*Nat'l Wildlife Fed'n v. Burlington N.R.R.*, 23 F.3d 1508 (9th Cir. 1994) ....... 21, 46

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005) ................................................................................. passim

*Nw. Coal. for Alts. to Pesticides v. Lyng*, 673 F. Supp. 1019 (D. Or. 1987) ......... 21

*Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007)   43, 44, 49

*Oregon Natural Desert Ass'n v. Kimbell*, CIV 07-1871-HA, 2009 WL 1663037, *1 (D. Or. June 15, 2009) ................................................................. 52

*Or. Natural Desert Ass'n v. Tidwell*, No. 07-1871-HA, 2010 WL 5464269, at *3 (D. Or. Dec. 30, 2010) ................................................................. 45

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195 (E.D. Cal. 2008) ................................................................................. 47

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001) ................................................................. 49

*Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) ........................ 49, 50

*Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489 (D. Or. 1992) ................... 49

*Pyramid Lake Paiute Tribe of Indians v. Nevada*, 724 F.3d 1181 (9th Cir. 2013)  48

*Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081 (W.D. Wash. 1991) ............... 53

*Earth Island Inst. v. Mosbacher*, 746 F. Supp. 964, 975 (N.D. Cal. 1990) ........... 45

*Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160, 1170 (D. Mont. 2008) ....... 35

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987) ........................................... 21

*Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988) ........................................ 22

*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) ....................... 48

*Sports Form, Inc. v. United Press Int'l*, 686 F.2d 750 (9th Cir. 1982) ................ 22

*Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118 (S.D. Cal.

2006) ................................................................................................. passim

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) ........................................ 33, 51

*TVA v. Hill*, 437 U.S. 153 (1978) ........................................................................ 23

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ................................................. 22

*W. Watersheds Project v. Salazar*, No. CV 11-00492 DMG (Ex), 2011 U.S. Dist.

LEXIS 151556 (C.D. Cal. Aug. 10, 2011) ................................................. 47

*Wash. Toxics Coal. v. EPA*, 413 F.3d 1024 (9th Cir. 2005) ..................... 23, 51, 52

*Wilderness Soc'y v. Tyrrel*, 701 F.Supp. 1473, 1491 (E.D. Cal. 1988) ................ 53

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ...................................... 22

*Young v. Reno*, 114 F.3d 879 (9th Cir. 1997) ...................................................... 19

## FEDERAL STATUTES

16 U.S.C. § 1533(a) ................................................................................................. 4

5 U.S.C. § 706(2)(A) ...................................................................................... passim

5 U.S.C. § 702 ................................................................................ 18

16 U.S.C. § 1522(6) ...................................................................... 15

16 U.S.C. § 1531(b) ...................................................................... 15

16 U.S.C. §§ 1531-1544 ................................................................. 2

16 U.S.C. § 1532(3) ...................................................................... 17

16 U.S.C. § 1532(19) .................................................................... 16

16 U.S.C. § 1533(f) .......................................................... 17, 40, 44

16 U.S.C. § 1533(f)(1)(B) ............................................................ 34

16 U.S.C. §§ 1533(f)(1)(B)(i)-(iii) ............................................... 18

16 U.S.C. § 1536(a)(2) ........................................................... passim

16 U.S.C. 1536(a)(3) ..................................................................... 16

16 U.S.C. § 1536(b)(4) .................................................................. 34

16 U.S.C. § 1538(a)(l) ................................................................... 17

16 U.S.C. § 1540(g)(4) .................................................................... 3

28 U.S.C. § 1331 ............................................................................. 2

28 U.S.C. § 1346 ............................................................................. 2

28 U.S.C. § 2412 ............................................................................. 3

28 U.S.C. § 1292 ......................................................................... 2

## FEDERAL REGULATIONS

50 C.F.R. § 402.01(b) ............................................................. 16

50 C.F.R. § 402.14(d) ............................................................. 16

50 C.F.R. §§ 402.14(g)(2), (g)(3) ......................................... 17

50 C.F.R. § 424.02(e) ............................................................. 15

50 C.F.R. § 424.02(m) ........................................................... 16

## MISCELLANEOUS

55 Fed. Reg. 26,114 (June 26, 1990) .................................... 4

77 Fed. Reg. 71,876 (Dec. 4, 2012) ...................................... 5

77 Fed. Reg. 71,905 ................................................................ 5

# I.    INTRODUCTION.

The northern spotted owl is perhaps the most studied bird in the world. Despite what we know about the species and what it requires to rescue it from extinction, it continues to decline in large part due to historic and current habitat loss through logging and new threats such as the barred owl.  In the Klamath Demography Study Area, where the Douglas Fire Complex burned in 2013, the spotted owl's ancient forest habitat is highly fragmented due to intensive clear cut logging on public and private industrial forestlands: half of the planning area is non-federal land that has been clear-cut and/or salvage logged.  Plaintiffs'-Appellants' Excerpts of Record (ER) 078 (map showing location of known spotted owl sites, harvest units, and landownership).  In spite of the poor habitat conditions, spotted owls proliferate in this area and even manage to produce young on a regular basis, although research now shows that this population of owls is exhibiting an "alarming" decline, indicating "potentially serious problems with maintaining a stable population."  ER 291.

Options still exist that would address legitimate public and firefighter safety concerns along roads (i.e., hazard tree removal), the implementation of which Cascadia does not oppose.  However, at a time when a federally-protected Threatened species continues to decline in part due to the clear cut logging of its habitat and the compounding negative effects of the barred owl, removing

1

additional functional owl habitat – which will result in the regulated killing of at least 24 northern spotted owls – defies rational explanation.

## II.    STATEMENT OF JURISDICTION.

Plaintiffs-Appellants Cascadia Wildlands, Oregon Wild, and Center for Biological Diversity (collectively, Cascadia) claims arise from the United States Fish and Wildlife Service's (FWS') and Roseburg Field Supervisor Jim Thrailkill's violations of the Endangered Species Act (ESA) of 1973 (16 U.S.C. §§ 1531-1544) and Administrative Procedure Act (APA) (5 U.S.C. § 7066) in failing to utilize the best available science in FWS' biological opinion for the Douglas Fire Complex Recovery Project (Project) that authorized the take of 24 Threatened northern spotted owls.  The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant), and because Cascadia sought judicial review of a final agency action pursuant to the APA (5 U.S.C. § 70-66).  The district court's denial of Cascadia's motion for a preliminary injunction is an appealable interlocutory order.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292.

Cascadia intends to seek attorney's fees and costs for this case, including this appeal, at an appropriate stage of the litigation, pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, and the ESA, 16 U.S.C. § 1540(g)(4).

## III.   ISSUES PRESENTED.

1.     Did FWS violate the ESA and APA when it failed to use the best available science in assessing whether the Douglas Fire Complex Recovery Project would result in jeopardy to the Threatened northern spotted owl?

2.     Did the FWS violate the ESA and APA when it failed to use the best available scientific information necessary to recover the Threatened northern spotted owl?

3.     Has Cascadia met its burden such that a preliminary injunction should issue?

## IV.   STATEMENT OF THE CASE.

This is a civil action for declaratory and injunctive relief under the APA (5 U.S.C. §§ 702-706), arising from Defendants-Appellees FWS' and Jim Thrailkill's violations of the ESA, and APA.  Plaintiffs-Appellants Cascadia challenge FWS's biological opinion authorizing the Douglas Fire Complex Recovery Project. Cascadia seeks to enjoin further implementation of the Douglas Fire Complex Project until the violations of law are remedied.  As logging is currently underway, Cascadia respectfully ask this court to issue a preliminary injunction barring further implementation of FWS' Douglas Fire Complex Biological Opinion pending a decision on the merits.

A.    **FACTUAL BACKGROUND.**

   1.    ***The Northern Spotted Owl (<u>Strix occidentalis caurina</u>).***

   The northern spotted owl (*Strix occidentalis caurina*) is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and "dark brown eyes surrounded by prominent facial disks."  ER 345.  Spotted owls rely on late-successional and old-growth forest habitat older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal.  These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly.

   Due to concerns over its widespread habitat loss and the lack of regulatory mechanisms to protect the species, the FWS listed the northern spotted owl as a threatened species under the Endangered Species Act on June 26, 1990.  16 U.S.C. § 1533(a); *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).  Critical habitat was first designated for the species in 1992, revised in 2008, and finalized in 2012.  *Endangered and Threatened Wildlife and Plants; Revised Critical*

4

*Habitat for the Northern Spotted Owl: Final Rule*, 77 Fed. Reg. 71,876 (Dec. 4,

2012). The "primary constituent elements" of spotted owl critical habitat

> typically include a moderate to high canopy cover (60 to over 80 percent); a
> multilayered, multispecies canopy with large (greater than 30 in (76 cm)
> dbh) overstory trees; a high incidence of large trees with various deformities
> (e.g., large cavities, broken tops, mistletoe infections, and other evidence of
> decadence); large snags; large accumulations of fallen trees and other woody
> debris on the ground; and sufficient open space below the canopy for
> northern spotted owls to fly.

77 FED. REG. 71,905. Spotted owl critical habitat within the Oregon Klamath

Province includes approximately 481,577 acres of spotted owl NRF habitat. The

Douglas Fire Complex BiOp concerns spotted owl Critical Habitat Unit (CHU) 9,

which encompasses 1,197,389 acres. Within CHU 9, suitable spotted owl habitat

will be removed through post-fire logging.

The Project planning area overlaps a long-term spotted owl demographic

study area, the Klamath Demography Study Area (KDSA). ER 051. According to

the BiOp, "there are 45 known spotted owl sites within or that overlap the action

area. Of these, 39 sites have home ranges that overlap areas of proposed harvest

activities consisting of salvage and road/route/landing construction." ER 077. The

demography data from the KDSA

> show that in 2013, prior to the fire, that 48 of the 158 sites surveyed were
> occupied by spotted owl pairs. In recent years, there has been a steady
> decline in the number of non-juvenile spotted owls detected in the KDSA
> despite a relatively constant survey effort. The meta-analysis indicated that
> spotted owl survival was stable and the population trend was stationary with
> confidence intervals overlapping 1.0 on the KDSA (Forsman et al. 2011)."

5

ER 061-62.

While the meta-analysis indicated spotted owl populations on the KDSA were stable through 2006, recently "Davis et al. 2013 documented many sites on the KDSA becoming vacant and most likely due to barred owls." ER 097. In fact, the demography data paints an even more grim picture:

> In recent years there has been a steady decline in the number of non-juveniles detected (Appendix B) and an even larger decrease in the number of pairs detected (Appendix A). *The number of non-juveniles detected in 2012 (134) was the lowest ever documented on the study area (Appendix B). The number of individual spotted owls during 2012 was 39.6% fewer than the high of 222 during 2002. The decline in the number of pairs was even more sizeable, with 48.4% fewer detected in 2012 than the high of 97 during 2005. The 50 pairs detected during 2012 was the lowest number documented during the study period.* Although the number of sites surveyed during this period has remained relatively constant, the number of pairs detected at sites has declined and the number of unoccupied sites has increased (Appendix A). *While the recent meta-analysis (Forsman et al, 2011a) indicated that survival on the KSA was stable through 2006, the most recent data regarding occupancy has shown a rapid decline, which suggests the stability of the survival rate may no longer be valid.*

ER 318 (emphasis added) (collecting and reporting on 2012 demography data).

Davis et al. 2013 go on to explain that

> The fecundity rate for 2012 was 0.191, which was lower than the average for the years 1990-2012 (0.320) (Appendix C). While the fecundity rate for spotted owls is known to fluctuate, we documented only 2 years during the most recent 10 years where the fecundity rate was above the overall average, indicating a downward trend (Figure 6). Forsman et al. (2011a) noted that the fecundity rate on the KSA was declining and the most recent data agrees with this conclusion. The number of juveniles detected within the KSA during 2012 (12) was much lower than the overall median (44) and followed 2011 (7), the lowest number of juveniles ever detected on the study area

6

> (Appendix B). *The 2011 and 2012 combination of the low fecundity rates, the lowest number of pairs ever documented, and the lowest number of non-juveniles ever documented may indicate potentially serious problems with maintaining a stable population. This is even more alarming since these results are following a long term downward trend.*

*Id*. at 319 (emphasis added).[1] This "alarming" "downward trend" continued

through 2013, as Davis et al. 2014 explain:

> The number of non-juveniles detected in 2013 (133) was the lowest ever documented on the study area (Appendix B). The number of individual spotted owls during 2013 was 40.0% fewer than the high of 222 during 2002...The decline in the number of pairs was even more sizeable than the decline of individuals, with 50.5% fewer detected in 2013 than the high of 97 during 2005. The 48 pairs detected during 2013 was the lowest number documented during the study period. Although the number of sites surveyed during this period has remained relatively constant, the number of pairs detected at sites has declined and the number of unoccupied sites has increased (Appendix A). While the recent meta-analysis (Forsman et al, 2011a) indicated that survival on the KSA was stable through 2006, the most recent data regarding occupancy has shown a steady and rapid decline, which suggests the stability of the survival rate may no longer be valid.

ER 289-90. With respect to fecundity in 2013, Davis et al. 2014 explain that

> The fecundity rate for 2013 was 0.160, which was lower than the average for the years 1990-2013 (0.312) (Appendix C)...The number of juveniles detected within the KSA during 2013 (15) was much lower than the overall median (44) and the most recent 3 years were the lowest number of juveniles detected on the study area (Appendix B).

*Id*. at 290-91. Based on the long-term demographic survey data, Davis et al. 2014

concluded that "the 2011-2013 combination of the low fecundity rates, the lowest

---

[1] Fecundity is the actual reproductive rate of a species measured by the number of offspring. A stable population typically has a fecundity rate of 1.0; a declining population will have a fecundity rate of less than 1.0, and an expanding population a rate of greater than 1.0.

number of pairs ever documented, and the lowest number of non-juveniles ever documented may indicate potentially serious problems with maintaining a stable population." *Id.*

## 2. *The Barred Owl (Strix varia).*

Barred owls (*Strix varia*) are native to North America, but only recently arrived in the West. Barred owls are slightly larger and more aggressive than spotted owls, and compete for the same habitat. According to the FWS, "managing sufficient habitat for the spotted owl now and into the future is important for its recovery...Based on the best available scientific information, competition from the barred owl (*S. varia*) poses a significant and complex threat to the spotted owl." ER 336.

"Forsman et al. (2011, pp. 69-70) found that the presence of barred owls led to a decrease in fecundity, apparent survival, and caused a decline in populations in most of the demography study areas included in their large scale modeling effort." ER 133. Other research has confirmed these conclusions. *Id.* at 134. "It is likely that all of the above analyses underestimated the effects of barred owls on the reproduction of spotted owls because spotted owls often cannot be relocated after they are displaced by barred owls (E. Forsman, pers. comm., cited in USDI FWS 2011, p. B-11)." *Id.* "Olson et al. (2005, p. 924) found that the presence of barred owls had a significant negative effect on the detectability of spotted owls." *Id.* at

133.  "Dugger et al. (2011, pp. 2463-2467) confirmed the synergistic effects of barred owls and territory habitat characteristics on extinction and colonization rates of territories by northern spotted owls.  Extinction rates of northern spotted owl territories nearly tripled when barred owls were detected (Dugger et al. 2011, p. 2464)."  *Id.* at 134.

In the KDSA, "Barred owls were detected on the highest percentage of sites during 2013, and the percentage of sites where spotted owls were detected was the lowest of any year."  ER 292.  In fact,

> The number of individual barred owl detections was increasing during recent years and 2013 was the highest number ever detected.  In addition, many of these detections appear to comprise more than one pair of barred owls within a single spotted owl site...There were at least 97 non-juvenile barred owls detected on the KSA during 2013 compared to 83 during 2012.  The numbers may be underestimated since detections were incidental while using spotted owl calls....

*Id*.  Barred owls in the Klamath Province are so widespread and problematic that FWS has instituted an experimental lethal control program to remove barred owls from the landscape.  Two of the experimental control areas are located adjacent to the KDSA and immediately north of the Douglas Fire Complex planning area.  *Id.* at 285 (Figure 2).

### 3.     *Revised Recovery Plan for the Northern Spotted Owl.*

FWS completed the Revised Recovery Plan for the Northern Spotted Owl (NSO Recovery Plan) in 2011.  The Oregon Klamath Province, where the Douglas

Complex Fire Recovery Project is located, is designated as a Recovery Unit for the spotted owl populations that inhabit it. ER 338. "The intended function of this Recovery Unit is to support high quality spotted owl NRF and dispersal habitats." ER 065. According to FWS, "'Recovery Actions' are near-term recommendations to guide the activities needed to accomplish the recovery objectives and achieve the recovery criteria," such that a species may be delisted from ESA protection. ER 337.

Recovery Action 10 directs federal agencies to: "Conserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population. The intent of this recovery action is to protect, enhance and develop habitat in the quantity and distribution necessary to provide for the long-term recovery of spotted owls." ER 341. The NSO Recovery Plan states "this recommendation includes currently occupied as well as historically occupied sites (collectively "spotted owl sites," see Appendix G: Glossary of Terms)." *Id.* at 339. The NSO Recovery Plan defines "spotted owl sites" as "an occupied spotted owl site or a spotted owl site where spotted owls were documented to be present in the past," *id.* at 349, and "conserve" as "to preserve to use, or manage wisely," *id*. at 348.

NSO Recovery Plan Recovery Action 12 directs: "In lands where management is focused on development of spotted owl habitat, post-fire

silvicultural activities should concentrate on conserving and restoring habitat elements that take a long time to develop (e.g., large trees, *medium and large snags, downed wood*)." *Id.* at 344 (emphasis added). Post-fire logging particularly targets medium and large fire-killed trees (snags) for removal. ER 052.

### 4.     *Northern Spotted Owl Use of Fire-Affected Forests.*

According to the BiOp, the

> best available information suggests that even with loss of forest canopy cover and other key habitat components typically found in NRF habitat, burned areas can provide some habitat function for spotted owls depending on fire severity. For example, areas that burned at low severity in some cases still provided spotted owl nesting, roosting, and foraging function. Areas that were burned at moderate and high severity may provide some limited nesting and foraging depending on burn patch size, edge type, and proximity to known sites (Bond et al. 2002, Bond et al. 2009, Clark 2007, Clark et al. 2011, and Clark et al. 2013 plus other authors per Appendix C).

ER 063. Moreover, "studies of spotted owls in post-fire landscapes indicate that spotted owls use forest stands that have been burned, but generally do not use stands that have been burned and logged." ER 343. While spotted owls prefer late-successional habitat when it is available, they have been observed foraging in areas burned by fires of all intensity categories. The research indicates that

> low- to moderate-severity fires that retain adequate canopy can function for nesting or roosting and thus allow the continued use of spotted owl activity centers, while territories that burned at high-severity no longer supported nesting spotted owls. It is expected that within mixed severity burns, spotted owls will select the best available post-fire suitable habitat and Activity Centers at these locations may persist into the future.

ER 174. However, results of these and other studies are confounded because of post-fire logging that occurred within the study areas. ER 346-47. "While the role of this burned habitat is unclear in overall spotted owl population maintenance, available information suggests that in the short-term this habitat, in particular when it is salvage logged, likely contributes to reductions in spotted owl survival and occupancy." ER 074.

"During the [BLM's] post-fire habitat updates areas that were characterized as NRF habitat pre-fire and still had some structure present post fire were characterized herein as Post-Fire Foraging (PFF) Habitat." ER 063. While "spotted owl use of these burned areas is well documented (Bond et al 2002, Bond et al. 2009, Clark 2007, Clark et al. 2011, Clark et al. 2013, Gaines et al. 1995, Jenness et al. 2004, King et al. 1998, Lee et al. 2012, Roberts et al. 2011)," ER 083, to Cascadia' knowledge, this is the first FWS biological opinion in Oregon that utilizes the new concept of "post-fire foraging" or "PFF" habitat in its effects and jeopardy analysis.

### 5. *Post-Fire Timber Harvest.*

The NSO Recovery Plan recognizes that logging owl habitat after wildfires poses a significant threat to the continued viability of the species:

> Detrimental ecological effects of post-fire timber harvest include: increased erosion and sedimentation, especially due to construction of new roads; damage to soils and nutrient-cycling processes due to compaction and

displacement of soils; reduction in soil-nutrient levels; removal of snags and, in many cases, live trees (both of which are habitat for spotted owls and their prey); decreased regeneration of trees; shortening in duration of early-successional ecosystems; increased spread of weeds from vehicles; damage to recolonizing vegetation; reduction in hiding cover and downed woody material used by spotted owl prey; altered composition of plant species; increased short-term fire risk when harvest generated slash is not treated and medium-term fire risk due to creation of conifer plantations; reduction in shading; increase in soil and stream temperatures; and alterations of patterns of landscape heterogeneity (Perry et al. 1989, McIver and Starr 2000, Beschta et al. 2004, Karr et al. 2004, Donato et al. 2006, Lindenmayer and Noss 2006, Reeves et al. 2006, Russell et al. 2006, Thompson et al. 2007, Lindenmayer et al. 2008, Johnson and Franklin 2009, Peterson et al. 2009, Swanson et al. 2010).

ER 343.

### 6. *The Douglas Fire Complex and the Douglas Fire Complex Recovery Project.*

The Douglas Fire Complex burned approximately 48,000 acres of federal

and non-federally-managed land in the southern Oregon Klamath Mountains:

Like the Oregon Klamath Mountains Province in general, the project sites and adjacent lands in the action area are composed of a fragmented landscape of alternating sections of Federal and intensively managed private lands dominated by clearcuts and young, homogenous conifer plantations...The action area is nearly an even mix of Federal Matrix lands and non-federal managed lands that occur in alternating sections. Pre-Douglas Complex fire, in general, spotted owl habitat in the action area consisted of a mosaic of late and mid-successional habitat on Federal lands interspersed with sections of early seral habitat on private lands...According to the District's post-fire estimates, less than half of the action area is characterized as spotted owl NRF habitat with the majority of this habitat on Federal lands (Assessment) (Table 3). Total spotted owl habitat which includes both NRF and dispersal-only habitat accounts for approximately 47 percent of the action area.

ER 062. Moreover,

13

> While State and private lands comprise more than half of the area within 1.3 miles of the project area, these lands at best provide marginal habitat for the spotted owl, and do not notably contribute to the viability of this species, given the management practices on those lands. Portions of these lands do not currently provide any habitat for the spotted owl and most likely any burned habitat on non-Federal land that may have provided a [post-fire foraging] function has already been salvage given the industry's aggressive actions toward removal of burned forest.

ER 097.

In response to the Douglas Fire Complex, the Medford District of the Bureau of Land Management (BLM) prepared the Douglas Fire Complex Recovery Project, authorizing salvage logging on approximately 1,276 acres of BLM land, including hazard tree removal along roads (to which Cascadia does not object), as well as logging of interior forests. The BLM submitted a Biological Assessment (BA) to FWS on April 28, 2014, determining the project "may affect and is likely to adversely affect" (LAA) spotted owls and their critical habitat. The Douglas Fire Complex Salvage Timber Sales include the Rogue Cow, Burnt Rattler, and Rock Star Timber Sales. The sales are located in the Grants Pass Resource Area of the BLM's Medford District, and logging operations are currently underway.

FWS issued a Biological Opinion for the Project on June 25, 2014, in response to BLM's submission of its biological assessment. In the BiOp, "the Service concludes that the proposed Project is likely to incidentally take 14 adult and up to 10 young spotted owls at seven sites. The take is in the form of harm

14

caused by habitat destruction or degradation via timber harvest of up 33 acres of NRF habitat and 1,049 acres of PFF habitat that is likely to significantly disrupt the breeding, feeding, and sheltering behavior of these spotted owls to an extent that causes injury or death." ER 100. The BiOp also concludes that the Project "is not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat." *Id*.

### B.   LEGAL BACKGROUND.

#### 1.   *The Endangered Species Act.*

Congress enacted the ESA with the purpose to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and to "provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). An Endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1522(6); 50 C.F.R. § 424.02(e). A Threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C. § 1532(19); 50 C.F.R. § 424.02(m).

Section 7 of the ESA requires federal agencies to conserve species listed as Endangered or Threatened under the ESA, and whenever a federal action may affect an ESA-listed species, the agency undertaking such an action must consult

the Service having jurisdiction over the relevant listed species. 16 U.S.C.

1536(a)(3). FWS is responsible for administering the ESA with respect to

terrestrial wildlife. 50 C.F.R. § 402.01(b). FWS, as the consulting agency for

terrestrial wildlife, evaluates the effects of the proposed federal action on the

survival and recovery of Endangered or Threatened species and any potential

destruction or adverse modification of critical habitat in a biological opinion. 16

U.S.C. § 1536(a)(2).

 A biological opinion (BiOp) is the heart of the ESA Section 7 consultation

process, which requires federal agencies to "insure that any action authorized,

funded, or carried out by such agency...is not likely to jeopardize the continued

existence of any endangered species or threatened species." 16 U.S.C. §

1536(a)(2). The biological opinion must be based on "the best scientific and

commercial data available or which can be obtained during the consultation for an

adequate review of the effects that an action may have upon listed species or

critical habitat." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d). In the biological

opinion, the FWS evaluates: 1) the current status of the listed species or critical

habitat; 2) the effects of the action; and 3) the cumulative effects to determine if

the proposed action will jeopardize the existence of the listed species. 50 C.F.R.

§§ 402.14(g)(2), (g)(3).

If the biological opinion concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a "reasonable and prudent alternative" to the agency action that avoids jeopardy and adverse modification and that the "incidental taking" of endangered or threatened species will not violate section 7(a)(2), the consulting agency can issue an Incidental Take Statement (ITS) which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. Section 9 of the ESA makes it unlawful for any person to take an ESA-listed species. 16 U.S.C. § 1538(a)(l).

Section 4 of the ESA states that FWS "shall develop and implement plans...referred to as 'recovery plans' for the conservation and recovery" of species listed under the Act. 16 U.S.C. § 1533(f). "Conservation" refers to "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary," and "conservation" is synonymous with the "recovery" of a species in the ESA context. 16 U.S.C. § 1532(3). Congress expects FWS to proactively utilize the conservation measures contained in recovery plans to remove the species from the protection of the ESA. 16 U.S.C. §§ 1533(f)(1)(B)(i)-(iii).

### 2.    *The Administrative Procedure Act.*

The APA confers a right of judicial review on any person that is adversely affected by agency action.  5 U.S.C. § 702.  Upon review, the court shall "hold unlawful and set aside agency actions…found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A). Arbitrary and capricious agency action occurs

> if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise...Agency action is valid if the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made.

*Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (citations and internal quotation marks omitted).  Furthermore, "an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so.  An agency cannot simply disregard contrary or inconvenient factual determinations...any more than it can ignore inconvenient facts when it writes on a blank slate."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009); *see also Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 959 (9th Cir. 2005); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 799 (9th Cir. 2005) (deference is not owed when agency fails to adhere to a consistent view); *Mount Graham Red Squirrel v.*

18

*Madigan*, 954 F.2d 1441, 1457 (9th Cir. 1992) (deference not due to the agency's "expertise" when it has fluctuated in its position, casting serious doubt on the validity of its analysis); *Young v. Reno*, 114 F.3d 879, 883 (9th Cir. 1997) (an "agency interpretation of a relevant provision which conflicts with an agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view"); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (*quoting Watt v. Alaska*, 451 U.S. 259, 273 (1981)) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view").

## V.     SUMMARY OF THE ARGUMENT.

FWS has failed to utilize the best available science in assessing whether the Project will jeopardize the continued existence of the Threatened northern spotted owl in at least three ways.  First, regarding the confounding effect that the presence of barred owls has on the ability to locate and confirm the presence of spotted owls, FWS failed to consider the effects of potential false "no occupancy" determinations in the agency's authorization of incidental take.  Second, regarding the amount of habitat spotted owls need to survive in a post-fire environment, FWS' jeopardy analysis entirely ignores the science cited in the BiOp and instead conducts its analysis based on spotted owl use of unburned habitat, a habitat condition that no longer exists in the project area.  Third, regarding FWS' own

direction to conserve known owl sites and important habitat elements, FWS failed

to utilize the best available science in authorizing take and failed to explain why

the NSO Recovery Plan no longer constitutes the best available science.  In all

instances, simply reciting the science is not enough under the ESA: there must be

evidence in the biological opinion that the agency utilized the best available

science to inform the jeopardy and incidental take decisions.  FWS has arbitrarily

and capriciously failed to meet the law's mandate.

## VI.    STANDARD OF REVIEW.

### A.    STANDARD OF REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT.

In reviewing the Forest Service's decision to approve the Douglas Fire

Complex Project, this Court must determine whether FWS' actions were "arbitrary

and capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A); *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th

Cir. 1998); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1331 (9th Cir. 1992).

An agency action is arbitrary and capricious "if the agency relied on factors

Congress did not intend it to consider, entirely failed to consider an important

aspect of the problem, or offered an explanation that runs counter to the evidence

before the agency or is so implausible that it could not be ascribed to a difference

in view or the product of agency expertise."  *McNair, 629 F.3d 1070, 1074 (9th*

*Cir. 2010)*.  Accordingly, this Court must determine whether FWS has complied with the ESA and APA.

### B.    STANDARD OF REVIEW FOR DENIAL OF A PRELIMINARY INJUNCTION.

The standard of review for a preliminary injunction is governed by Federal Rule of Civil Procedure 65.  *See Nw. Coal. for Alts. to Pesticides v. Lyng*, 673 F. Supp. 1019 (D. Or. 1987) (employing analysis of *Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983)).  The purpose of a preliminary injunction is to preserve the status quo pending a determination of the issues on the merits.  *Chalk v. U.S. Dist. Court Cent. Dist.*, 840 F.2d 701, 704 (9th Cir. 1988).  The denial of a preliminary injunction should be overturned if the lower court incorrectly applied the law, relied on clearly erroneous findings of fact, or otherwise abused its discretion.  *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999); *Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996); *Nat'l Wildlife Fed'n v. Burlington N.R.R.*, 23 F.3d 1508, 1510 (9th Cir. 1994); and *Sierra Club v. Marsh*, 816 F.2d 1376, 1381 (9th Cir. 1987).

A district court's decision is based on an erroneous legal standard if: (1) the court did not employ the appropriate legal standards that govern the issuance of a preliminary injunction; or (2) in applying the appropriate standards, the court misapprehended the law with respect to the underlying issues in the litigation. *Sports Form, Inc. v. United Press Int'l*, 686 F.2d 750, 752 (9th Cir. 1982).  In such

circumstances this Court has found that the district court's decision is reviewed *de novo*. *Does 1-5*, 83 F.3d at 1152; *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1313 (9th Cir. 1988). Additionally, this Court reviews *de novo* a district court's review of agency action under § 706(2)(A) of the APA. *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 914 (9th Cir. 1995).

### C. STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION.

The purpose of an injunction is to preserve the relative positions of the parties pending a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981). A preliminary injunction (PI) is warranted when a moving party can demonstrate that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favors, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). In cases brought under the Endangered Species Act, however, Congress has already determined that the balance of equities and public interest favor an injunction. *TVA v. Hill*, 437 U.S. 153, 194 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities"). As the Ninth Circuit explained, "Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species." *Wash. Toxics Coal. v. EPA*, 413 F.3d

22

1024, 1035 (9th Cir. 2005); *Nat'l Wildlife Fed'n*, 422 F.3d at 793-94 ("[i]n cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests").

Additionally, courts may apply a "sliding scale" approach in their consideration of the success and harm factors. *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (continuing to apply the sliding scale approach after *Winter*). Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another: a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits. *Id.* at 1131. Cascadia, therefore, need only raise "serious questions going to the merits," so long as they can demonstrate that the balance of hardships tips sharply in their favor and that the other *Winter* factors have been met. *Id.* at 1135 ("the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test").

/// /// ///

/// /// ///

/// /// ///

23

## VII.  CASCADIA HAS RAISED SERIOUS QUESTIONS AND IS LIKELY TO PREVAIL ON THE MERITS.

### A.    FWS Failed to Use the Best Available Scientific Information in Assessing Jeopardy to the Threatened Northern Spotted Owl from the Proposed Action.

The ESA requires FWS to utilize the best available science when determining whether a Federal action is likely to jeopardize the continued existence of a listed species.  16 U.S.C. § 1536(a)(2).  FWS has failed to utilize the best available science in assessing whether the Project will jeopardize the continued existence of the Threatened northern spotted owl in at least two ways: first, regarding the confounding effect that the presence of barred owls has on the ability to locate and confirm the presence of spotted owls; and second, regarding the amount of habitat spotted owls need to survive in a post-fire environment.

### 1.    _Barred Owl Effect on Spotted Owl Presence/Absence._

The NSO Recovery Plan states that "based on the best available scientific information, competition from the barred owl (_S. varia_) poses a significant and complex threat to the spotted owl."  ER 336; _see also_, ER 133-34 (explaining extent and magnitude of threat).  According to the BiOp, "Numerous barred owls have been detected across the action area in that barred owls have been detected in almost half of the known spotted owl sites (Davis et al. 2014)."  ER 064,307 (owl sites with "+" denote barred owl presence).

24

Spotted owls are somewhat unique as a species in that they are relatively easy to locate in the field by using a series of bird calls that mimic spotted owl hoots and whistles, to which the spotted owl will respond with its own call or fly in to the surveyor to investigate the source of the calls. Surveyor calls, in conjunction with offering a mouse to an incoming bird, are used in FWS-approved protocol surveys to determine whether a forested stand or known spotted owl site is occupied by a spotted owl pair or individual. However,

> Monitoring and management of northern spotted owls has become more complicated due to their possible reduced detectability when barred owls are present (Kelly et al. 2003, pp. 51-52; Courtney et al. 2004, p. 7-16 ; Olson et al. 2005, p. 929; Crozier et al. 2006, p.766-767). Evidence that northern spotted owls were responding less frequently during surveys led the Service and its many research partners to update the northern spotted owl survey protocol (USDI FWS 2012b).

ER 134.

The best available science suggests that surveyors' efforts to identify spotted owl sites in the field using spotted owl calls are confounded by the presence of barred owls: research indicates that spotted owls are increasingly not responding to survey calls, even though present in the forested stand, due to the presence of barred owls. The BiOp goes on to explain that

> Evidence suggests that barred owls are exacerbating the spotted owl population decline, particularly in Washington, portions of Oregon, and the northern coast of California (Gutiérrez et al. 2004, pp. 739-740; Olson et al. 2005, pp. 930-931). There is no evidence that the increasing trend in barred owls has stabilized in any portion of the spotted owl's range in the western United States, and "there are no grounds for optimistic views suggesting that

25

barred owl impacts on northern spotted owls have been already fully realized" (Gutiérrez et al. 2004, pp. 7-38). In Oregon, Dugger et al. (2011, p. 2466) reported that some northern spotted owl pairs retained their territories and continued to survive and successfully reproduce during their study even when barred owls were present, but that the effects of reduced old growth forest in the core habitat areas were compounded when barred owls were present.

ER 134. Davis et al. 2014 explain that:

> Bailey et al. (2009) and Crozier et al. (2006) determined that the presence of barred owls negatively affected the detection probabilities of spotted owls. Olson et al. (2005) determined that barred owl presence positively affected local-extinction probabilities or negatively affected colonization probabilities of spotted owls. They concluded that a further decline in the proportion of sites occupied by spotted owls is expected. The steady decline in the number of pairs and the number of non-juveniles on the KSA since 2002 (Appendix A, B) seems to indicate that the KSA population may be experiencing these effects...

ER 292.

Because spotted owls are increasingly often nonresponsive to surveyors in habitat that is also occupied by barred owls, surveys for spotted owls that result in a "no occupancy" determination in fact may not accurately indicate the presence or absence of a spotted owl at that location. Whether or not a known spotted owl site is currently "occupied" is a central factor in FWS' methodologies for assessing whether the proposed action will or will not jeopardize the northern spotted owl, ER 077-78, 083-84, and therefore also the extent of incidental take authorized in the ITS. Consequently, because of FWS' emphasis on spotted owl occupancy in assessing jeopardy, whether or not spotted owls are in fact present in or near an

area to be logged is highly relevant to determining whether the agency's decision is arbitrary and capricious. *McNair*, 629 F.3d at 1074.

FWS clearly acknowledges that based on the best available science, it is becoming increasingly difficult to determine whether a spotted owl site is in fact occupied by the species. The issue of how barred owls are affecting the ability to positively determine site occupancy, given that site occupancy is a critical factor in FWS' determination that the Douglas Fire Complex project will not result in the jeopardy of the northern spotted owl, was not resolved in the BiOp, and the effects of potential false "no occupancy" determinations are not accounted for in FWS' consideration of the effects of the proposed action and the authorization of incidental take.

To be clear, Cascadia's argument is *not* that FWS failed to catalogue the relevant science on this issue, but rather that there is no evidence in the biological opinion that the agency in fact *used* it to reach its jeopardy determination. Simply restating the science is not enough under the ESA: there must be evidence in the biological opinion of its use. 16 U.S.C. § 1536(a)(2). While the biological opinion draws on many years of pre-fire survey data to locate probable spotted owl sites in the planning area, there is nothing in the BiOp that demonstrates that the agency took into consideration the fact that these surveys may be underreporting spotted owl occupancy at these sites (or that "unoccupied" sites may actually be occupied).

27

Instead, the calculus used by FWS to determine what sites would be affected by the Project takes the surveys presence/absence determinations at face value, and in no way qualifies those results based on the well-accepted conclusions of the research cited in the BiOp that explained that spotted owl occupancy determinations are confounded by the presence of barred owls. Given that barred owl presence is a significant and growing problem in the planning area, this omission is especially problematic.

Ignoring the weight of the scientific evidence indicating that presence/absence surveys are likely to underestimate the actual presence of spotted owls indicates that FWS "entirely failed to consider an important aspect of the problem" or "or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" when it reached its No Jeopardy conclusion in the Douglas Fire Complex BiOp. *Lands Council*, 629 F.3d at 1074. Since FWS has not "considered the relevant factors and articulated a rational connection between the facts found and the choices made," its biological opinion authorizing the proposed action is arbitrary, capricious, and not in accordance with the *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008); 5 U.S.C. § 706(2)(A); 16 U.S.C. §§ 1536(a)(2), (b)(4).

2. *Expanding and Shifting Spotted Owl Home Ranges and Core Areas.*

Barred owls are not the only threat to the spotted owl that is magnified post-fire: the best available scientific information also indicates that spotted owls expand their core areas and home ranges in post-fire environments in order to satisfy life cycle needs including roosting and foraging. According to the BiOp,

> Evaluations of spotted owl habitat are usually conducted at two spatial scales; the home range and core areas. The home range is the "area traversed by the individual in its normal activities of food gathering, mating, and caring for young" (Burt 1943:351, cited in USDI FWS 2009). Within home ranges, areas receiving concentrated use, typically surrounding the nest site and favored foraging areas, are called core areas.

ER 125. Pre-fire in the Douglas Fire Complex planning area, spotted owl "core areas" were identified as the 0.5-mile radius circular area encompassing 500 acres around known or likely nest sites. *Id.*, 068. Surrounding the 0.5-mile/500 acre core area is a larger concentric circle comprising a 3,398-acre "home range," which represents a 1.3-mile radius from the known or likely nest site. *Id.*, 069. In *unburned* forests, the best available science indicates that retaining at least 40% of the estimated home range, and 50% percent of the estimated core area, as suitable (NRF) habitat provides the best chance for spotted owl fitness or viability. *Id.*, 070.

In contrast,

Where spotted owl activity centers are affected by fire (any range of severities) but sufficient habitat remains in the home range and immediately

29

> adjacent area, site fidelity may cause spotted owls to increase the size of
> their home ranges or shift locations to encompass the best available habitats
> rather than vacate the burned site (King et al. 1998, Clark 2007, Clark et al.
> 2011, 2013). Thus, a shift by spotted owls may occur under conditions
> where the burned area is presumably still functional in terms of extant
> spotted owl habitat and the affected area is considered to be occupied. This
> shift is likely to occur within the pre-fire home range of the affected spotted
> owl(s).

ER 073. Indeed, "Clark (2007) found that in high severity burned landscapes, and

landscapes with salvage harvest, spotted owls are likely to increase their home

ranges to compensate for the loss of suitable habitat and this will likely impact

spotted owl habitat-fitness." ER 084. Clark[2] and others concluded that "spotted

owls may shift their habitat use patterns and/or increase their home range size to

encompass the best available suitable habitat post-fire rather than vacate the

_____

[2] In the District Court, FWS took issue issue with Cascadia's citation of Clark 2007
in support of Cascadia's argument that FWS failed to use the best available science
in reaching its jeopardy determination. ER 019. This critique is misplaced
because Clark 2007 was cited by FWS itself in the biological opinion as one study
in the body of the best available science on the issue of spotted owl use of burned
landscapes. If FWS believes that the results of Clark 2007 are inapplicable to the
present situation, or that his results are spurious, the place for that discussion is in
the biological opinion, not the post-hoc arguments of counsel in litigation. *Motor
Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50
(1983) ("courts may not accept...counsel's post hoc rationalizations for agency
action"). Regardless, Cascadia has also pointed to King et al. 1998, Clark et al.
2011, Clark 2013, and Dugger 2009 – also cited by FWS in the biological opinion
and which conclude that spotted owls expand and shift their ranges post-fire – as
additional support for this contention. Even if Clark 2007's results are eschewed,
because FWS has not taken issue with the conclusions of these other researchers,
the fact remains that there is no evidence in the record to indicate that FWS
incorporated this science when it reached its jeopardy determination.

affected site, unless very poor habitat conditions exist over much of their home range (King et al. 1998, Clark 2007)." ER 074.

Spotted owls that shift and/or expand their home ranges in response to wildfire take advantage of unoccupied habitat that may be necessary for the species to persist in a post-fire environment. The NSO Recovery Plan states that

> it is not uncommon for an occupied spotted owl site to be unoccupied in subsequent years, only to be re-occupied by the same or different spotted owls two, three or even more years later (Dugger et al. 2009). While temporarily unoccupied, these sites provide conservation value to the species by providing habitat that can be used by spotted owls on nearby sites while also providing viable locations on which future pairs or territorial singles can establish territories.

ER 342. Unoccupied owl habitat is important post-fire because it represents vacant territory that may be recolonized by shifting or dispersing owls. In a heavily fragmented and checkerboarded landscape like the Project planning area, these "vacant" sites may represent the best remaining suitable habitat. *Id.*

Despite the best available science indicating that spotted owls are likely to expand their home ranges post-fire in order to meet their life cycle needs, FWS' effects analysis relies on habitat benchmarks (i.e., effects to the 1.3-mile home range and .5-mile core area) that are based on spotted owl use of _unburned_ habitat. While the BiOp discusses the science supporting the conclusion that owls use more habitat post-fire than pre-fire, the effects analysis nonetheless entirely eschews this

31

science and conducts its analysis based on owl use of unburned habitat, a habitat condition that no longer exists in the planning area.

Again, Cascadia's argument is *not* that FWS failed to discuss this research; instead, Cascadia maintains that FWS was required to *use* the undisputed best available science in assessing whether the Project will result in jeopardy to the species. There is no evidence in the BiOp that the jeopardy determination is based on the science indicating that spotted owls are likely to expand and/or shift their home ranges and core areas. Indeed, it is undisputed that FWS uses a home range of .5 miles in size, and a home range of 1.3 miles in size in assessing the effects to spotted owls from timber harvest in *unburned* forests, ER 069, but in this case, FWS has used the exact same sized home ranges and core areas – in the exact same pre-fire locations – when assessing effects to spotted owls using *burned* forests, despite the best available science indicating that owls will use larger, and different, areas. *See*, *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (in the NEPA context, holding that reliance on mitigation measures for unburned forests was inappropriate in burned forests without providing a scientific rationale for doing so).

Nor does the ESA require Cascadia to offer a different or particular home range or core area size that FWS *should* have used in its analysis. *Thomas v. Peterson*, 753 F.2d 754, 765 (9th Cir. 1985) ("it is not the responsibility of the

plaintiff to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed"). Indeed, had Cascadia provided such information, FWS and this court would likely have held that this effort was in vain, as courts are required to defer to the expert agency in a "battle of the experts." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Instead, the ESA requires the FWS to utilize the relevant science in developing appropriate home range and core area sizes that reflect that science and the burned nature of the planning area, which FWS failed to do. 16 U.S.C. § 1536(a)(2).

In sum, while the biological opinion discusses the science supporting the conclusion that spotted owls use more and different habitat post-fire than pre-fire, the effects and jeopardy analysis nonetheless entirely ignores this science and instead conducts its analysis based on spotted owl use of unburned habitat, a habitat condition that no longer exists in the project area. FWS has provided no rationale for disregarding the undisputed best science on spotted owl use of habitat post-fire in its jeopardy analysis, indicating that it has "entirely failed to consider an important aspect of the problem" and "offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *McNair*, 629 F.3d at 1074. The agency's conclusions are therefore arbitrary, capricious, not based on

33

the best available scientific information, and not in accordance with the ESA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2); 16 U.S.C. § 1536(b)(4).

### B.   FWS Failed to Use the Best Available Scientific Information to Recover the Threatened Northern Spotted Owl.

In addition to the requirement to use the best available science in carrying out Section 7 duties, ESA Section 4 states "[t]he Secretary shall develop and implement recovery plans for the conservation and recovery of the listed species." 16 U.S.C. § 1533(f)(1)(B). "The language and structure of the ESA's provisions for recovery plans shows that FWS must make a conscientious and educated effort to implement the plans for the recovery of the species," because Congress expects FWS to proactively utilize the conservation measures contained in recovery plans to achieve recovery objectives and criteria, and to eventually remove the species from the protection of the ESA. *Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1137 (S.D. Cal. 2006) (Bartel).

If FWS chooses not to utilize the best available science as directed by the ESA, or decides that the Recovery Plan no longer constitutes the best available science, FWS is required to explain why it has changed course in the biological opinion. *Nat'l Wildlife Fed'n*, 422 F.3d at 799. Stated differently, if the biological opinion and terms of the incidental take permit (ITP) are inconsistent with the strategies and objectives in the Recovery Plan, then FWS is required to "explain

34

why it reached inconsistent conclusions from the same evidence." *Bartel*, 470 F. Supp. 2d at 1136-37; *see also*, *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160, 1170 (D. Mont. 2008) (*citing Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 42; *Nat'l Wildlife Fed'n*, 422 F.3d at 799.

FWS' NSO Recovery Plan includes specific recovery actions that represent the "best available scientific and commercial data available" that FWS is required to utilize during the consultation process. 16 U.S.C. § 1536(a)(2). In 2011, with the spotted owl declining across its range, FWS concluded that Recovery Actions 10 and 12 were necessary to reverse the downward trend. Today, the spotted owl is still declining across its range, and in fact accelerating in the Klamath population, yet FWS has authorized levels of incidental take and habitat removal inconsistent with FWS' previous conclusions that conservation of all spotted owl sites and important habitat elements that take a long time to develop was crucial to the survival and recovery of the species. The agency has offered no explanation for this change in position and inconsistent conclusions in the Biological Opinion, and prevailing case law in this Circuit therefore requires the decision to be set aside as arbitrary and capricious. *McNair*, 629 F.3d at 1074; *Defenders of Wildlife*, 420 F.3d at 959.

*1.*     *Recovery Action 10.*

In the 2011 NSO Recovery Plan, FWS concluded that conserving currently and historically occupied owl sites was necessary to provide additional demographic support for the spotted owl.[3]  ER 339-40.  Specifically, FWS observed that:

> The three main threats to the spotted owl are competition from barred owls, past habitat loss, and current habitat loss (USFWS 2008b).  Despite the habitat protections of the NWFP, the most recent demographic analysis (Forsman et al. 2011) indicates that spotted owl populations are declining on 7 of the 11 active demographic study areas at about 3 percent annually range-wide.  Scientific peer reviewers and Forsman et al. (2011) recommended that we address this downward demographic trend by protecting known spotted owl sites in addition to the retention of structurally-complex forest habitat.

ER 339.[4]  Consequently, the best available science embodied in Recovery Action 10 directs agencies to: "Conserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population," *id*. at 341, and "this recommendation includes currently occupied as well as

---

[3] Defendant-Appellee Jim Thrailkill was extensively involved in the development of the 2011 Revised NSO Recovery Plan: he is credited as having provided research and writing assistance, was part of the modeling advisory group, and was relied upon as a habitat expert.  ER 333-35.

[4] The most current demography data acknowledges the 2011 Forsman et al. conclusion but states "while the recent meta-analysis (Forsman et al, 2011a) indicated that survival on the KSA was stable through 2006, the most recent data regarding occupancy has shown a steady and rapid decline, which suggests the stability of the survival rate may no longer be valid."  ER 290.

36

historically occupied sites (collectively "spotted owl sites," see Appendix G:
Glossary of Terms)." *Id.* at 339.

Now, in 2014, rather than heed its own Recovery Plan and advice to
recover the spotted owl by protecting all occupied owl sites, FWS has authorized
take of at least 7 currently occupied as well as historically occupied sites (14 owls),
5 of which were identified as high priority owl sites. ER 080, 307. FWS also
anticipates the additional take of 10 juvenile owls that are the offspring of these 7
owl pairs. FWS states that although "meeting the intent of Recovery Action 10
was very challenging," ER 098, nevertheless the "conservation of high priority
spotted owl sites" was addressed by "ranking the 39 known spotted owl sites in the
action area relative to the duration of spotted owl site occupancy and successful
reproduction, along with post-fire habitat conditions." ER 088. Pointing to a
*ranking* of the 39 known spotted owls in the action area does not utilize the best
available science to *conserve* spotted owls sites, particularly when—despite the
ranking—FWS nonetheless authorized the incidental take of the very sites that are
identified as "high priority" due to high pair occupancy and reproductive rates.
For example, high priority site #2274O has had pairs 22 of the last 24 years, is a
"highly productive site" with two young produced in the last 6 years, and FWS
found that "sufficient habitat conditions likely remain post-fire to support spotted
owls." ER 306, 307 (Site Priority Summary); ER 081. Despite this, FWS

37

authorized take of this site. The same situation exists for high priority owl sites #0903O, #4604O, #4605O, and #4606A/4606B/4606O where FWS authorized take. ER 307, 80 (Table 5).

In addition to the 7 incidental take sites, FWS has authorized significant habitat removal at an additional 25 owl sites where no incidental take will allegedly occur. The majority of salvage logging in the Douglas Fire Complex is in spotted owl home ranges, as "only about 12 percent of the action area is not covered by a home range," ER 082, prompting FWS to conclude that it was "challenging to meet the full intent of this recovery action." *Id*. at 088. The biological opinion states that the incidental take of 24 owls in an area with declining populations is "reasonably consistent" with FWS' previous conclusion in the NSO Recovery Plan that conserving currently and historically occupied owl sites was necessary to provide additional demographic support for the spotted owl, but did not specifically address *how* authorizing the take of high priority owl sites was in fact consistent with the best available science articulated in the Recovery Plan. ER 088.

FWS' disregard for the best available science in Recovery Action 10 is particularly arbitrary and capricious given recent demography data. In 2013 in the KDSA prior to the Douglas Fire Complex, only 48 of the 158 sites surveyed were occupied by spotted owl pairs. ER 061-62. Annual monitoring reports for the

Klamath population over the last several years show an "alarming" and

accelerating downward spiral, indicating the continuing need to conserve and

protect remaining spotted owl sites: "The 2011-2013 combination of the low

fecundity rates, the lowest number of pairs ever documented, and the lowest

number of non-juveniles ever documented may indicate potentially serious

problems with maintaining a stable population."  ER 291.  In the KDSA, "the most

recent data regarding occupancy has shown a steady and rapid decline, which

suggests the stability of the survival rate may no longer be valid."  *Id.* at 290.

A federal project that removes substantial suitable habitat in or near 45 owl

sites, and results in the incidental take of 24 owls, will certainly accelerate the

already "steady and rapid decline" of the spotted owl.  Indeed, it is little wonder

that the spotted owl population continues to decline when FWS continues to

authorize extensive incidental take in an area that is already heavily fragmented

and experiencing a barred owl invasion.  On the other hand, conserving remaining

spotted owl sites according to the direction of the Recovery Plan would address the

documented serious problems with population stability, but the Douglas Fire

Complex Project, with the extensive level of take associated with it, is precisely the

type of project where Congress expected FWS to proactively utilize the best

available scientific information in Recovery Plan recovery actions.  FWS is

required to provide a reasoned analysis for deviating from the best available

science in its biological opinion, but has failed to do in violation of the APA and ESA. *Bartel*, 470 F. Supp. 2d at 1136-37, *Nat'l Wildlife Fed'n*, 422 F.3d at 799; 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1533(f).

## 2. *Recovery Action 12.*

In the 2011 NSO Recovery Plan, FWS concluded that post-fire silvicultural activities must conserve large trees, medium snags, and downed wood in order to recover the spotted owl. Specifically, FWS reviewed the literature on post-fire forest and spotted owl management and concluded that "consistent with restoration goals, post-fire management in these areas should promote the development of habitat elements that support spotted owls and their prey, especially those which require the most time to develop or recover (e.g., large trees, snags, downed wood)." ER 344. FWS embodied this commitment in Recovery Action 12, which directs: "In lands where management is focused on development of spotted owl habitat, post-fire silvicultural activities should concentrate on conserving and restoring habitat elements that take a long time to develop (e.g., large trees, medium and large snags, downed wood)." *Id*. Further, "[a]s a general rule, forest management activities that are likely to diminish a home range's capability to support spotted owl occupancy, survival and reproduction in the long-term should be discouraged." *Id.* at 342.

Now, in 2014, the Douglas Fire Complex Biological Opinion and Incidental Take Statement authorize the removal of critical spotted owl habitat elements, the very activity that the best available scientific information concludes "should be discouraged," but FWS provides no explanation of why it has eschewed the best available scientific information.  ER 100.

FWS states that habitat elements that take a long time to develop (large trees, medium and large snags, and downed wood) will be reduced by up to 33%, a decline that "is not insignificant or discountable" because these habitat elements "will be reduced in a meaningfully measureable manner…." ER 095.  The agency claims that this adverse effect may be mitigated because at the stand scale, "the Project will provide for a higher retention of snags (up to 5 times more) and coarse woody debris within spotted owl critical habitat and 0.5 mile core-use areas of high priority sites as compared to the District's 1995 RMP standards for Matrix lands...." ER 088.[5]  This response is problematic for several reasons.

First, according to the BLM, snags will be retained along the edges or outside of salvage units: snag retention would be "clumped typically near sides or bottom of units or other logistically feasible areas, to reduce safety concerns with harvesting operational feasibility."  ER 311.  The BLM's environmental analysis,

---

[5] The Medford District RMP standards and guidelines require that, over time, one to two snags per acre will be present to meet the requirement for cavity nesting birds at 40 percent of potential population levels.  ER 310.

upon which FWS based its ESA consultation, therefore does *not* indicate that snags will be retained at five times the amount required by the RMP: the majority of harvest units will be devoid of snags and it is unlikely that these clear cut areas will provide suitable owl habitat post-logging.[6]  Because the action agency has not committed to retaining large diameter snags in-unit, FWS may not rely on this speculative activity to off-set adverse effects to spotted owls.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935-36 (9th Cir. 2008).

Second, even if the project retained additional functional snags than required by the BLM's RMP (which is dubious at best), this approach is still inconsistent with the direction of the best available science, which states that "post-fire silvicultural activities should concentrate on conserving and restoring habitat elements that take a long time to develop (e.g., large trees, medium and large snags, downed wood)."  ER 344.  Removing habitat elements (here, snags and down wood) through logging, rather than "concentrate[ing] on conserving and restoring" them, is plainly inconsistent with the best available science.  *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1128-31 (9th Cir. 2007) (holding that salvage logging large diameter snags violated Northwest Forest Plan requirement to "focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags").

---

[6] Moreover, it appears that the "additional" retained snags are unlikely to be large enough to satisfy owl habitat needs.  ER 304 (comment SRA20).

Third, FWS asserts that logging large diameter snags will be mitigated through replanting the burned areas, which presumably will result in snags in the very long term. ER 088 ("Reforestation of the burned units is also planned with a suite of species appropriate for conditions on the action area"). However, the action agency (BLM) stated that "Reforestation is not proposed in the Douglas Fire Complex Recovery Project...." ER 282. The Ninth Circuit has stated that absent specific and binding plans, not even "a sincere general commitment to future improvements may be included in the proposed action in order to offset its certain immediate negative effects." *Nat'l Wildlife Fed'n*, 524 F.3d at 936-37. FWS is impermissibly relying on unplanned future projects, specifically reforestation efforts as well as augmented snag retention, to offset immediate and long-lasting negative effects on the spotted owl.

FWS concluded in its BiOp that the Douglas Fire Complex Project is "reasonably consistent" with the best available science, but this is plainly erroneous given that post-fire logging activities remove the very habitat elements the NSO Recovery Plan states should be protected and restored. ER 089, 34; *see generally*, *Brong*, 492 F.3d at 1128-31. FWS is required to provide a reasoned analysis for deviating from the best available science in its biological opinion, which it has failed to do. *Bartel*, 470 F. Supp. 2d at 1136-37; *Nat'l Wildlife Fed'n*, 422 F.3d at 799. FWS "entirely failed to consider an important aspect of the

43

problem" when it did not explain why the Project need not conserve and restore

habitat elements that take a long time to develop (e.g., large trees, medium and

large snags, downed wood), as directed by the NSO Recovery Plan, when the

project will in fact delay the attainment of such long-term habitat elements in the

future by removing them. *McNair*, 629 F.3d at 1074. FWS has "relied on factors

Congress did not intend it to consider" when it relied on additional snag retention

and replanting the action agency does not intend to implement in issuing the

Douglas Fire Complex BiOp. *Id.* Consequently, FWS has acted arbitrarily,

capriciously, and not in accordance with the ESA. 5 U.S.C. § 706(2)(A); 16

U.S.C. § 1533(f).

## VIII. CASCADIA AND THE NORTHERN SPOTTED OWL ARE SUFFERING IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF, THE BALANCE OF EQUITIES TIPS IN FAVOR OF AN INJUNCTION, AND AN INJUNCTION IS IN THE PUBLIC INTEREST.

Cascadia and the northern spotted owl are currently suffering three types of

irreparable harm from the salvage logging of the Douglas Fire Complex Project: 1)

the unauthorized taking of a listed species that may result in jeopardy; 2) the loss

of post-fire northern spotted owl habitat; and 3), the failure to follow the proper

environmental analysis procedures required by law.

First, the unauthorized taking of spotted owls – a species that is already

threatened with extinction and which continues to decline year after year both

rangewide and in the planning area – is clearly irreparable. *See, Or. Natural Desert Ass'n v. Tidwell*, No. 07-1871-HA, 2010 WL 5464269, at *3 (D. Or. Dec. 30, 2010) ("habitat modification that is reasonably certain to injure an endangered species establishes irreparable injury") (*citing Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 1999)); *see also Earth Island Inst. v. Mosbacher*, 746 F. Supp. 964, 975 (N.D. Cal. 1990), *aff'd, Earth Island Inst. v. Mosbacher*, 929 F.2d 1449 (9th Cir. 1991) ("for those species now threatened with extinction, the harm may be irreparable in the most extreme sense of that overused term"); *Forest Conserv. Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995) ("[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult").  In this case, FWS has authorized the incidental take of 24 northern spotted owls in an area that used to be a stronghold for the species but is now showing an "alarming" decline.  This level of take is "likely to significantly disrupt the breeding, feeding, and sheltering behavior of these spotted owls to an extent that causes injury or death."  ER 100. This is an impact the species cannot sustain.

In the Ninth Circuit, a plaintiff need not show irreparable harm to the entire species in order for an injunction to issue.  *Ctr. for Biological Diversity v. Fish & Wildlife Serv.*, No. C-08-1278 EMC, 2011 WL 6813200, at *4 (N.D. Cal. Dec. 28, 2011) ("[a]lthough Defendants argue that harm to the species as a whole is

required, Ninth Circuit case law does not support this proposition"); *Nat'l Wildlife Fed'n v. Burlington N.R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (recognizing that threat of extinction is not required before an injunction may issue under ESA, as that would be "contrary to the spirit of the statute"); *Marbled Murrelet v. Pacific Lumber Co.*, 83 F.3d 1060 (9th Cir. 1996) ("We have repeatedly held that an imminent threat of future harm is sufficient for the issuance of an injunction under the ESA"); *Defenders of Wildlife v. Sec'y, U.S. DOI*, 354 F. Supp. 2d 1156 (D. Or. 2005) (injunction against delisting of gray wolf); *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085 (E.D. Wash. 2006) (injunction halting snowmobiling effects on caribou); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195 (E.D. Cal. 2008) (injunction against water withdrawals); *W. Watersheds Project v. Salazar*, No. CV 11-00492 DMG (Ex), 2011 U.S. Dist. LEXIS 151556 (C.D. Cal. Aug. 10, 2011) (no injunction issued, but the court held that "the harm to the population at the proposed site brought about by the loss of thousands of acres of desert habitat is itself a sufficient irreparable injury to warrant equitable relief"); *cf*, ER 012, FN5.

FWS possesses indisputable information showing that the spotted owl's continued existence in the Klamath region and range-wide is in grave doubt. The most recently available demography data indicates that "the number of individual spotted owls during 2013 was 40.0% fewer than the high of 222 during 2002," and

that "the decline in the number of pairs was even more sizeable than the decline of individuals, with 50.5% fewer detected in 2013 than the high of 97 during 2005. The 48 pairs detected during 2013 was the lowest number documented during the study period." ER 289. These results prompted the demographers to conclude that "while the recent meta-analysis (Forsman et al, 2011a) indicated that survival on the KSA was stable through 2006, the most recent data regarding occupancy has shown a steady and rapid decline, which suggests the stability of the survival rate may no longer be valid," and "the 2011-2013 combination of the low fecundity rates, the lowest number of pairs ever documented, and the lowest number of non-juveniles ever documented may indicate potentially serious problems with maintaining a stable population." *Id.* at 290-91. "This is even more alarming since these results are following a long term downward trend." ER 319-20.

There are 50% fewer spotted owl pairs today in the KDSA than there were in 2005, and an additional 24 owls will be lost as a result of the ongoing implementation of the Douglas Fire Complex project. It is abundantly clear that the spotted owl population is already in serious trouble, and the loss of an additional 24 owls – representing 18% of the remaining population – would be an irreparable blow to the continued existence of this species. ER 285 (indicating a total population of 133 owls in the KDSA). It is likely that the Project is the straw that breaks the camel's back, and an injunction is necessary in order to protect the

47

spotted owl against, literally, a death by a thousand cuts. *Pyramid Lake Paiute Tribe of Indians v. Nevada*, 724 F.3d 1181, 1188 (9th Cir. 2013); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011); *Ctr. For Native Ecosystems v. U.S. Fish & Wildlife Serv*., 795 F. Supp. 2d 1199, 1207 (D. Colo. 2011).

Second, the loss of mature and old-growth forest habitat, including that affected by wildfire, which Cascadia uses and enjoys, and which, by definition, cannot grow back within Cascadia's members' lifetimes, is irreparable. *Cottrell*, 632 F.3d at 1135 (logging causes "actual and irreparable injury" to environmental plaintiffs' ability to view, experience, and utilize burned forested areas in their natural state, even when other areas nearby would remain unlogged); *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1509 (D. Or. 1992) ("[c]ourts in this circuit have recognized that timber cutting causes irreparable damage and have enjoined cutting when it occurs without proper observance of NEPA procedures and other environmental laws"); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994) ("timber sales constitute per se irreversible and irretrievable commitments of resources" under the ESA). If the Project continues to move forward, fire-affected forests will be salvage logged, at least 24 northern spotted owls will be incidentally taken, and recovery of this species will be cast into doubt. Cascadia is being irreparably harmed by this ongoing activity. ER 182-84, 188-90, 193-95.

The district court concluded that because the amount of burned forest is "small," there can be no irreparable harm to Cascadia.  ER 038.  Any claim that the Project is conservative or inconsequential because it only affects only "some" of the burned landscape improperly seeks to dismiss the concentrated nature of the logging and its effects by choosing a perspective and scale of analysis that minimizes these effects.  *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035 (9th Cir. 2001) (rejecting agency effort to minimize effects of logging by selecting broad scale for analysis); *Brong, 492 F.3d at 1130 (9th Cir. 2007)*; *Anderson v. Evans*, 371 F.3d 475, 489-93 (9th Cir. 2004).

As the Ninth Circuit has held,

> The Forest Service responds that the Project areas represent only six percent of the acreage damaged by fire.  It argues that because AWR members can "view, experience, and utilize" other areas of the forest, including other fire-damaged areas that are not part of the Project, they are not harmed by logging in the Project.

> This argument proves too much.  Its logical extension is that a plaintiff can never suffer irreparable injury resulting from environmental harm in a forest area as long as there are other areas of the forest that are not harmed.  The Project will prevent the use and enjoyment by AWR members of 1,652 acres of the forest.  This is hardly a de minimus injury.

*Cottrell*, 632 F.3d at 1135.

The ongoing logging has already interrupted the natural recovery occurring in the Project area, and there is no way to "put the trees back on the stump" now that they have been removed.  There is no substitute for the areas that have been

logged, or that will be logged, even in the surrounding forest. *Hoffman on behalf of Hoffman on behalf of NLRB v. Cement Masons Union Local 337, etc.*, 468 F.2d 1187, 1192 (9th Cir. 1972) (holding that "each parcel of real property is unique," and that each parcel "serves a unique public interest because of its location and other intangible factors").

Irreparable environmental harm caused by the Project will extend beyond the lifetimes of many of Cascadia's members. *Pac. Rivers Council*, 30 F.3d at 1057 ("timber sales constitute per se irreversible and irretrievable commitments of resources" under the ESA); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987) ("environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable"). Although the courts have often considered the irreplaceable value of old growth forests untouched by fire, the best available science indicates that the burned forests in the Project area, if left unsalvaged, will provide the best forest habitat in the future. *Cottrell*, 632 F.3d at 1135.

Third, Cascadia is irreparably harmed by FWS' failure to follow the procedural requirements of Sections 4 and 7 of the ESA. As the Ninth Circuit has held, "it is not the responsibility of the plaintiff to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed." *Wash. Toxics Coal.*, 413 F.3d at 1035.

Indeed, "the Ninth Circuit has repeatedly found that the purpose of consultation under the ESA is to prevent future substantive violations of the ESA, such that irreparable damage is presumed to flow from a failure properly to evaluate the environmental impact of a major federal action." *Ctr. for Biological Diversity*, 2011 WL 6813200, at *5); *Thomas*, 753 F.2d at 764 ("irreparable damage is presumed to flow from a failure properly to evaluate the environmental impact of a major federal action" and "given a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction of the project pending compliance with the ESA").  An injunction pending appeal provides the only remedy that will address the ongoing irreparable harm to Cascadia's interests. *Kettle Range Conserv. Group v. U.S. BLM*, 150 F.3d 1083, 1088-89 (9th Cir. 1998).

Having demonstrated they will suffer irreparable harm without injunctive relief, Cascadia need not demonstrate that the balance of the equities tips in its favor because "Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species." *Wash. Toxics Coal.*, 413 F.3d at 1035; *Nat'l Wildlife Fed'n*, 422 F.3d at 793 ("[i]n cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests"). As Judge Haggerty explained, "[b]ecause Congress has determined that listed

species are to be afforded the highest of priorities, this court finds that Cascadia has also shown that the balance of equities tips in their favor, and that an injunction is in the public interest." *Oregon Natural Desert Ass'n v. Kimbell*, CIV 07-1871-HA, 2009 WL 1663037, *1 (D. Or. June 15, 2009).

Even if other factors are considered here, they weigh heavily in favor of an injunction. The district court improperly held that economic considerations override the balance struck by Congress in the ESA. ER 014; *see Nat'l Wildlife Fed'n*, 422 F.3d at 793-94 ("In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests"). However, the courts have repeatedly held that economic loss is not irreparable and does not provide a basis for denying injunctive relief. *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. 1081, 1095 (W.D. Wash. 1991) ("while the loss of old growth is permanent, the economic effects of an injunction are temporary and can be minimized in many ways"); *L.A. Mem'l Coliseum Com. v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (holding that "mere injuries, however substantial, in terms of money, time and energy necessarily expended…are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm")).

52

In balancing the harms, "the Government's economic loss cannot be considered compelling if it is to be gained in contravention of federal law." *Wilderness Soc'y v. Tyrrel*, 701 F.Supp. 1473, 1491 (E.D. Cal. 1988) (*citing Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988), *rev'd on other grounds*, 918 F.2d 813 (9th Cir. 1990). Judge Dwyer specifically rejected the arguments that an injunction should not issue because of the possible prospective economic impact on the timber industry, holding that any "economic effects of an injunction are temporary and can be minimized in many ways," and that an injunction across the *entire range* of the spotted owl was appropriate. *Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081, 1081 (W.D. Wash. 1991). By contrast, Cascadia's requested relief here is narrowly tailored: Cascadia seeks to enjoin only the logging taking place away from roads for economic recovery, and do not seek to enjoin hazard tree removal along roads traveled by the public. ER 184, 190, 206d, 203.

The District Court found that an injunction should not issue because it would preclude any implementation of the project (including non-economic recovery actions), and may result in an increased risk of insect infestations. ER 014. These claims are unsubstantiated. According to the BLM, the 2012 and 2013 insect and disease surveys shows no evidence that there were any large bark beetle populations active within the Douglas Complex Fire. ER 309. Moreover, the

action agency (BLM) could seek and/or use existing appropriated dollars or dollars already received from the ongoing logging as well as the roadside hazard tree removal, to conduct any remediation: income from economic recovery salvage is not the only way to address any outstanding resource needs, and the opposing parties have not shown otherwise. The opposing parties have not demonstrated that they are unable to overcome the minimal hardship of the economic expense of delay, or that extraordinary circumstances exist that counsel against an injunction pending appeal.

Environmental damage "by its nature, can seldom be adequately remedied by money damages and is often permanently or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545. Indeed, the public's interest in making sure that federal agencies manage public lands in compliance with environmental laws "invokes a public interest of the highest order: the interest in having government officials act in accordance with the law." *Evans*, 771 F.Supp. at 1096. An injunction would protect the environment from degradation caused by the salvage logging, but also would protect the public's interest in preventing FWS from acting in a manner inconsistent with the ESA. "Such compliance is especially appropriate in light of the strong public policy expressed in the nation's environmental laws."

54

*Citizen's Alert Regarding Environment v. U.S. Dep't of Justice, 1995 WL 748246, 11 (D.D.C. 1995).*

## IX.    CONCLUSION.

For the forgoing reasons, Cascadia respectfully requests that this Court reverse the District Court's denial of the issuance of a preliminary injunction and declare that the Douglas Fire Complex Project violates the ESA and APA for the reasons stated above.

Respectfully submitted and dated this 28th day of October, 2014.

*/s/ Susan Jane M. Brown* .
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon  97232
Ph. (503) 914-1323
Fax (541) 485-2457
brown@westernlaw.org

Jordan Beckett (OSB# 120666)
Beckett Law Office PC
2305 Ashland St. Suite C 311
Ashland, OR 97520
Ph. (541) 510-0333
Fax: (541) 210-9294
jordan@roguevalleylawyer.com

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

☒    This brief contains 13,852 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), *or*

☐    This brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

☒    This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 point New Times Roman, *or*

☐    This brief has been prepared in a monospaced typeface using _____ with _____ characters per inch and _____ font.

Respectfully submitted and dated this 28th day of October, 2014.

            */s/ Susan Jane M. Brown*    .
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon  97232
Ph. (503) 914-1323
Fax (541) 485-2457
brown@westernlaw.org

Jordan Beckett (OSB# 120666)
Beckett Law Office PC
2305 Ashland St. Suite C 311

Ashland, OR 97520
Ph. (541) 510-0333
Fax: (541) 210-9294
jordan@roguevalleylawyer.com

*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Cascadia Wildlands, Oregon Wild, and Center for Biological Diversity state that they are non-profit entities that have not issued shares to the public and has no affiliates, parent companies, or subsidiaries issuing shares to the public.

Respectfully submitted and dated this 28th day of October, 2014.

    */s/ Susan Jane M. Brown    .*
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon  97232
Ph. (503) 914-1323
Fax (541) 485-2457
brown@westernlaw.org

Jordan Beckett (OSB# 120666)
Beckett Law Office PC
2305 Ashland St. Suite C 311
Ashland, OR 97520
Ph. (541) 510-0333
Fax: (541) 210-9294
jordan@roguevalleylawyer.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 28, 2014. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


_/s/ Susan Jane M. Brown_____.

Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
Fax (541) 485-2457
brown@westernlaw.org

Jordan Beckett (OSB# 120666)
Beckett Law Office PC
2305 Ashland St. Suite C 311
Ashland, OR 97520
Ph. (541) 510-0333
Fax: (541) 210-9294
jordan@roguevalleylawyer.com

_Attorneys for Plaintiffs-Appellants_

## STATEMENT OF RELATED CASE

Pursuant to Circuit Rule 28-2.6, counsel for Plaintiffs-Appellants certifies that to her knowledge no related case is pending in this Court.

Respectfully submitted and dated this 28th day of October, 2014.

*/s/ Susan Jane M. Brown* .
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
Fax (541) 485-2457
brown@westernlaw.org

Jordan Beckett (OSB# 120666)
Beckett Law Office PC
2305 Ashland St. Suite C 311
Ashland, OR 97520
Ph. (541) 510-0333
Fax: (541) 210-9294
jordan@roguevalleylawyer.com

*Attorneys for Plaintiffs-Appellants*